IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| HARTFORD FIRE INSURANCE COMPANY, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | No. 09 C 4049 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| BANK OF AMERICA, CORUS BANK, and ILLINOIS NATIONAL BANK | ) ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Hartford Fire Insurance Co. ("Hartford") filed a complaint against Bank of America, Corus Bank, and Illinois National Bank ("INB") seeking a declaratory judgment of Hartford's rights and obligations regarding claims asserted by the defendants under Illinois Community Currency Exchange Bonds ("the bonds").[1] INB filed a counterclaim seeking a declaration that it is entitled to coverage under the bonds and requesting damages in the amount of $123,009.23 plus costs. Both Hartford and INB move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, INB's motion [#60] is granted and Hartford's motion [#62] is denied.

**BACKGROUND**

**I. Hartford Issues Bonds to the Currency Exchanges**

The Illinois Community Currency Exchange Act ("ICCEA") requires Illinois currency exchanges to obtain surety bonds. 205 Ill. Comp. Stat. 405/5(a) ("Before any license shall be issued to a community currency exchange the applicant shall file annually with and have approved by the Director a surety bond, issued by a bonding company authorized to do business

---
[1] Bank of America and Corus Bank have settled their claims with Hartford.

in this State . . . ."). Springfield Currency Exchange, Inc. #1 ("SCE #1") and Springfield Currency Exchange, Inc. #2 ("SCE #2") (collectively, "the currency exchanges") were both owned by Jay Stone and regulated by the ICCEA. Hartford issued SCE #1 a bond for the amount of $85,000 and SCE #2 a bond for the amount of $56,000. The bonds provided insurance "for any liability incurred by the currency exchange on any money orders issued or sold by the currency exchange . . . and for any liability incurred by the currency exchange in connection with the rendering of any of the services referred to in Section 3" of the ICCEA. Ex. 1 to Stip. Section 3 of the ICCEA authorizes currency exchanges to issue money orders. 205 Ill. Comp. Stat. 405/3 ("[N]othing contained herein shall prevent a community or an ambulatory currency exchange . . . from issuing money orders . . . ."). The Illinois Department of Financial and Professional Regulation ("IDFPR") is the obligee on the bonds and entitled to seek reimbursement on behalf of any creditors who make a claim under the bonds.

## II.     INB Authorizes Overdrafts for the Currency Exchanges' Accounts

SCE #1 and SCE #2 maintained separate bank accounts at INB. Both accounts were subject to a deposit account terms and conditions agreement, which held the currency exchanges "liable for any account shortage resulting from charges or overdrafts" on their respective accounts. Ex. 4 to Stip. at 6; Ex. 9 to Stip. at 6. The agreement did not require INB to authorize overdrafts. On May 5, 2008, INB entered into an additional agreement with SCE #1 and SCE #2 that modified the existing relationships between the parties to account for the currency exchanges' difficult financial position. Stone acknowledged that he needed INB to provide cash on a daily basis to SCE #1 and SCE #2 in order for the currency exchanges to continue operating, despite the currency exchanges' accounts being overdue and overdrawn. The May 5,

2008 agreement specified that INB would authorize overdrafts to a limited extent to allow the currency exchanges to continue operating while Stone pursued the sale of his businesses. Stone agreed to have SCE #1 and SCE #2 under contract for sale by May 15, 2008. INB subsequently extended the date to May 31, 2008, although this date also was not met.

Due to SCE #1's and SCE #2's failure to abide by the agreements, INB decided to no longer fund the operation of the currency exchanges on July 1, 2008, at which time the currency exchanges ceased operating.[2] Nonetheless, INB continued to cover overdrafts on the currency exchanges' accounts for some time. INB had agreed to honor money orders issued by SCE #1 and SCE #2 on or before July 1, 2008 up to the limit of the currency exchanges' bonds as part of an understanding with the IDFPR on the closing of SCE #1 and SCE #2. Specifically, from June 27, 2008 to August 22, 2008, INB paid hundreds of money orders issued by SCE #1 even though SCE #1 had insufficient funds in its account to cover them. From June 18, 2008 to July 14, 2008, INB covered hundreds of similar overdrafts on the SCE #2 account.

### III. Hartford Denies Claims Under the Bonds

INB sought reimbursement based on the bonds for the payments it had made on the money orders issued by the currency exchanges that resulted in overdrafts. On December 11, 2008, the IDFPR submitted claims on behalf of INB to Hartford for reimbursement for overdrafts of $67,009.23 on the SCE #1 account and $56,000 on the SCE #2 account.

On April 17, 2009, Hartford denied the claims for reimbursement. Hartford claimed that by paying the money orders that created the overdrafts, INB discharged SCE #1's and SCE #2's liability on the money orders and released Hartford from any payment requirements under the

---

[2] SCE #1's license agreement was revoked effective September 3, 2008. SCE #2's license was revoked effective July 25, 2008.

bonds. IDFPR and Hartford then exchanged letters in which the IDFPR supported coverage of the overdrafts under the bonds, reasoning:

> By agreeing to pay the money orders and making the bond claim, these claimants, the banks, are in fact protecting and providing an additional convenience to the consumers served by the currency exchange. . . . Due to the length of time to recover on a bond claim if a consumer has a money order returned and has to make the bond claim directly to the bonding company, the consumer will, in most cases, have to pay an additional rent, bill or tax payment to replace the returned money order. . . . Therefore, the claims made by [INB] are consistent with the intent and purposes of the [ICCEA] to protect the consumer by saving them money and providing a convenience.

Ex. 14 to Stip. Hartford, however, maintained its decision to deny IDFPR's claims under the bonds. This suit followed.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at

4

598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## DISCUSSION

Resolution of this case depends on the construction of the bonds. The bonds state they are for the "benefit of any creditor" of the specified currency exchange as insurance for "any liability incurred by the currency exchange on any money orders issued or sold by the currency exchange." Ex. 1 to Stip. The bond also insures against "any liability incurred by the currency exchange in connection with the rendering of any of the services referred to in Section 3." *Id.* The referenced services include the issuance of money orders. 205 Ill. Comp. Stat. 405/3. Thus, for the bond to apply, (1) the currency exchanges must have incurred liability when INB charged overdrafts on their respective accounts, and (2) that liability must be "on" or "in connection with" the issuance or sale of money orders by the currency exchanges.

**I.     Liability Requirement**

Illinois law authorizes banks to charge overdrafts on a customer's account. 810 Ill. Comp. Stat. 5/4-401 ("A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft."). The bank's action creates an implied promise under the law that the account owner will reimburse the bank for the overdraft. *First Nat'l Bank of Evergreen Park* v. *Lambert*, 440 N.E.2d 306, 310, 109 Ill. App. 3d 177, 64 Ill. Dec. 754 (1982). In addition, INB entered into deposit agreements with

5

both SCE #1 and SCE #2 that hold the account owner "liable for any account shortage resulting from charges or overdrafts." Ex. 4 to Stip. at 6; Ex. 9 to Stip. at 6. Therefore, when INB authorized the overdrafts on the currency exchanges' accounts by paying the money orders they issued, SCE #1 and SCE #2 became immediately liable to INB for the reimbursement of the amounts created by those overdrafts.

## II. "On" or "In Connection With" Requirement

Although a liability clearly exists, the bonds issued by Hartford only cover "any liability" that is "on" or "in connection with" the issuance or sale of the money orders covered by the bond. Hartford argues that by paying the money orders, INB discharged all of SCE #1's and SCE #2's liability "on" or "in connection with" the money orders, thus relieving Hartford from the obligation of reimbursing INB under the Illinois Uniform Commercial Code ("UCC"). *See* 805 Ill. Comp. Stat. 5/3-310(b)(1) ("Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check."). INB argues, however, that the broad language and purpose of the bonds and the ICCEA, in addition to public policy, should lead this court to nonetheless find coverage.

It is true that INB discharged the currency exchanges' liability on the money orders. 805 Ill. Comp. Stat. 5/3-310(b)(1); *State Bank of Chicago* v. *Mid-City Trust & Sav. Bank*, 129 N.E. 498, 499, 295 Ill. 599 (1920) ("Payment is the final act which extinguishes a bill."). But a new liability arose as a result—the overdrafts. This overdraft liability was not created until INB paid the money orders and exists separate and apart from the liability it discharged. While not specifically a liability "on" the money order, the overdrafts do constitute a liability incurred "in connection with" the currency exchanges' provision of services as authorized by the ICCEA.

6

This is reflected not only by the fact that the overdrafts can be traced directly to the money orders, but also by the legislative intent of the ICCEA and sound public policy.

### A. Legislative Intent

The ICCEA provides the foundation for the bonds and, in fact, is incorporated into the bonds. *Willis* v. *Fid. & Deposit Co. of Maryland*, 103 N.E.2d 513, 518, 345 Ill. App. 373 (1952) ("The statute constitutes a part of the bond and policy of insurance."). The primary legislative purpose of the ICCEA is "the protection of consumers served by currency exchanges." *Cottage-63rd St. Currency Exch., Inc.* v. *Callahan*, 432 N.E.2d 1258, 1261, 104 Ill. App. 3d 586, 60 Ill. Dec. 359 (1982); *see also Thillens, Inc.* v. *Morey*, 144 N.E.2d 735, 744, 11 Ill. 2d 579 (1957); *First Fin. Ins. Co.* v. *Purolator Sec., Inc.*, 388 N.E.2d 17, 21, 69 Ill. App. 3d 413, 26 Ill. Dec. 393 (1979). As currency exchanges provide "vital services to Illinois citizens," the Illinois legislature has deemed it "in the public interest to promote and foster the community currency exchange business and to insure the financial stability thereof." 205 Ill. Comp. Stat. 405/4.1; *see Gadlin* v. *Auditor of Pub. Accounts*, 110 N.E.2d 234, 237, 414 Ill. 89 (1953); *Willis*, 103 N.E.2d at 518.

In this case, INB acted in furtherance of consumer protection by paying the money orders issued by SCE #1 and SCE #2. Primarily, INB prevented a number of potential penalties or fees that customers might have otherwise incurred if each customer had been forced to individually seek coverage from Hartford. The IDFPR reiterated this purpose in its letter to Hartford seeking payment on the bonds on INB's behalf: "[I]f a consumer has a money order returned and has to make the bond claim directly to the bonding company, the consumer will, in most cases, have to pay an additional rent, bill or tax payment to replace the returned money order." Ex. 14 to Stip.

The precedent Hartford cites as precluding protection for providers of business services is distinguishable. In *First Financial*, the insurer of a currency exchange brought suit against a security company after the currency exchange was burglarized. 388 N.E.2d at 17. The case addressed whether a contract exculpating the security company for negligence was against the public policy of the ICCEA. *Id* at 21. Unlike this case, the relationship between the insurer and the security firm had no connection to the consumer protection intended by the legislature. Hartford also cites *Cottage-63rd Street*, which dealt with a currency exchange that was itself seeking protection under the ICCEA in a dispute over its license. 432 N.E.2d at 1261. There, however, the court simply declined to add the currency exchange into the class protected by the statute and affirmed the primary purpose of the ICCEA as "the protection of consumers served by currency exchanges." *Id.*

In contrast, the overdraft liability at issue here had an impact on consumer protection that directly serves the purposes of the ICCEA. By honoring the money orders, INB "insure[d] the financial stability" of the currency exchange transactions by preventing the money orders from being returned. 205 Ill. Comp. Stat. 405/4.1. Unlike the security company in *First Financial*, INB provided a service that "promote[d] and foster[ed]" the interests of consumers that the ICCEA is intended to protect. *Id.* INB's actions in allowing the overdrafts protected customers and only put the currency exchanges further into INB's debt. The actions did nothing to "protect the currency exchange in its relationships" with INB, which is the type of protection rejected by the court in *First Financial*. 388 N.E.2d at 21. Instead, by honoring the money orders despite the currency exchanges' lack of funds, INB fulfilled the legislative purpose of the ICCEA—protecting consumers from the potential instability of currency exchanges.

## B. Public Policy

Hartford claims that allowing coverage in this case is against public policy because it (1) leaves some customers exposed after the amount of bond insurance is exhausted, and (2) discourages banks and currency exchanges from being more attentive in accounting for money order funds. The facts of this case contradict these arguments.

First, the amount of coverage for the Hartford bonds is already limited by the express amounts of the bonds. The coverage amount does not change whether it is INB bringing claims for the full amount of the bonds or customers making individual claims up to the full amount of the bonds. In fact, INB removed a potentially arduous step for customers who might have otherwise not been able to successfully bring claims under the bonds without incurring late fees or other hardships. INB's actions also meant that Hartford did not have to process hundreds of small individual claims and was instead able to consider these claims in the aggregate.

Second, covering the overdraft liability in this case does not encourage banks or currency exchanges to exercise less diligence when accounting for money order funds. INB had continuing relationships with SCE #1 and SCE #2 in this case and clearly understood the precarious financial situation of both currency exchanges. There is no evidence that a lack of financial diligence played any part in this case, and there is no reason to suspect that finding coverage under the bonds will encourage less care in future cases.

INB did not gain any financial advantage by paying the money orders, even if the bonds provide full coverage. It is true that, as reflected in its deposit agreements, INB could have simply rejected the money orders and avoided the entire loss it attempts to recover in this case. *See Mitchell Buick & Oldsmobile Sales, Inc.* v. *McHenry Sav. Bank*, 601 N.E.2d 1360, 1364,

9

235 Ill. App. 3d 978, 176 Ill. Dec. 662 (1992) ("[A] bank is not ordinarily liable to the payee of a check made by a drawer who has no funds on deposit to cover the check, even though the bank has previously honored overdrafts."). But, as reflected in its agreement with the IDFPR, INB sought instead to help ensure the orderly winding up of the currency exchanges' business in furtherance of Illinois public policy regarding currency exchanges.

By paying the money orders, INB discharged the currency exchanges' liability on the money orders while at the same time creating an immediate liability between itself and the currency exchanges. The latter liability arose in connection with the services provided by the currency exchanges in issuing money orders to consumers. INB's actions were in line with the legislative purpose and public policy behind requiring the bonds. Thus, INB is entitled to coverage under the bonds for the overdrafts it incurred in connection with honored money orders issued by SCE #1 and SCE #2.

## CONCLUSION AND ORDER

For the foregoing reasons, INB's motion [#60] for summary judgment is granted and Hartford's motion [#62] for summary judgment is denied. Judgment will be entered for INB on the complaint and INB's counterclaim.


Dated: June 20, 2011         Enter:  _____
                                     JOAN HUMPHREY LEFKOW
                                     United States District Judge